The District Court made two primary procedural errors, the first being that the trial court did not view the facts in a light most favorable to the non-moving party. Now there were cross motions for summary judgment in this case. I think by the time I'm finished here today, I'm going to talk myself into factual disputes, so that's going to take care of my client's summary judgment. I think when a plaintiff loses in a district court and you're on appeal, that's what you're left with. So I'll acknowledge that right out of the gate. But so that leaves us with just looking at the defense briefs below and whether the trial court viewed the facts as required by Matsushita. The second procedural error that plaintiffs are asserting is that the trial court failed to appreciate or grant any inferences from the circumstantial evidence. And that is primarily focused on Defendant Harris. And it's over the factual dispute as to whether the House was or was not red-tagged, whether she accurately or inaccurately read what was on the screen in front of her on June 20, 2013. It's our position that by failing to grant any inferences and recognize the circumstantial evidence, and I say that because both Ms. Harris and the trial court kept using the term no evidence, no evidence, no evidence. You see that several times. Well, Ms. Harris did not directly admit, and we didn't have anybody looking over her shoulder on June 20, 2013. And of course, plaintiffs didn't have the opportunity to capture the screen. But circumstantially, we put in the record Ms. Wright's observation of the website a few days later, Mr. Tyler's observation. And then when we did the Freedom of Information Act request five weeks later, we asked for what she relied on. And the 9-1-1 director sent us a printout of the page that showed clearance of the red tag in 2011. And he didn't qualify what he sent us. So if he meant to, he should have, but he didn't. So circumstantially, and again, in the light most favorable to plaintiffs, does that create enough for a jury to conclude that Ms. Harris misread that information in June of 2013? And we submit that it does, and that was one of the procedural errors. But don't you have to have some evidence of Harris having acted with either reckless disregard for truth, or knowingly and deliberately providing false information? What evidence do you have of that? For the federal qualified immunity, or the state governmental immunity? I would say at least for the federal immunity. Well, I think we get into the negligent versus incompetence, plainly incompetent. I don't phrase it the way you did in my brief, I don't think, but that's why I focused on the arguments about a government actor that is plainly incompetent, which I think sort of incorporates the reckless disregard. So you're saying plain incompetence is enough, and she acted plainly incompetent? Yes. Do you have enough evidence to show that here? I think my best evidence, and again, it's circumstantial to get to that finding, is her failure to educate herself on exactly how that website worked, and how to read it, and how to make sure that she knew she was doing, reading it correctly. And that is supported, I think, by the evidence that I obtained from her about her work history, previously with the city of Lansing, and then with Ingham County. And it just so happened these were Lansing police officers that were involved, so I wanted to show that continuity of her work, and her exposure and interaction with these officers over that time span, which, again, I'm asking for a favorable inference to the plaintiffs, that that puts her on notice, that these officers are using that red tag information to enter people's dwellings. Well, that's my, I guess, my question. What evidence do we have that Ms. Harris knew what the officers actually intended to do with the information? That she knew that they were going to enter the premises, or enter the premises without consent or without a warrant? Do you have evidence of that? And, Your Honor, I just, I did just give you my best evidence of that. It's my argument that her tenure and her interaction with the Lansing Police Department, either she knew or should have known. So, what answers are there that she, she said she was aware that they asked, that they would get verification from her to make sure her place was red tagged before they went in? No. So, what are you relying on? I can't represent that from this record. Okay, so what is it that you're... Just an inference from her tenure as a 911 dispatcher, and the number of times that she had been asked, well, she had been asked to look only in her short few months as a supervisor, but she was aware of the process throughout her tenure as a dispatcher. What process? Looking up the red tag status. Looking up, but not knowing why? Yes, I don't have any evidence, direct evidence that she knows that when the officers are told there's a red tag, they intend to enter. I don't have any... You what? I don't have any direct evidence that anybody has ever told her that that's what they do with it. So, what's the inference then? I'm not sure what inference the court is to draw. I thought the inference you were saying is that she knew that officers would contact dispatch to get information about the red tag. Once the officers got that information, they would enter these uninhabitable premises. That somehow she knew that in providing red tag confirmation that officers would regularly, routinely act upon it. But it sounds like that's not the inference that you're suggesting the court should have drawn. That she should have known that's what they do with it. Should have known what? Should have known that they would enter. I think there's a bit of just basic logic in there and is that we're talking about the red tag of the structure. If they weren't planning on entering it, there wouldn't really be any other reason for them to know whether it's red tagged or not. You're saying it's just common sense that if they're calling to verify it, they're verifying it for a reason. Right. The equivalent would be running the registration tag on a car in the street to see if it's expired. Well, if it's expired, the officer's going to take some enforcement action. Is he going to write a ticket? Is he going to tow it? Is he going to arrest somebody? The dispatchers know that the information they give out is used for something. So because a red tag goes on a structure and her tenure, I think combined, at least at summary judgment stage, would a jury agree with me? I don't know, but I'm at summary judgment stage. That was my point. I just want to change the subject unless my colleagues object, but how does it work with respect to the actual officers? Now, they've been told that the place has been red tagged. How do you articulate your theory against them? And I can go one step further. Let's assume it is red tagged. We start with the presumption in Katz v. U.S. that all warrantless searches are unreasonable. So you're saying red tag or not, they should know that you cannot enter a house like that without a warrant? For that purpose, yes. For the purpose of... The red tag. For this misdemeanor purpose? Yes. Okay. So then you move from that to the fact that the dispatcher error is imputed to the officers, and we have Smoke v. Hall and United States v. Hensley. What? I'm sorry, you're saying it's imputed to them? The error, the fact that it was not red tagged. So I'm sorry, I jumped back to Ms. Harris on you there without warning. A lot of our discussion has been whether or not Ms. Harris can be liable, but you want me to focus on the police. So I just thought, right. So even if red tagged, that gets us to Payton v. New York and Welsh v. Wisconsin. Okay, so let's assume it is unconstitutional. You did not sue the city. Right. They're named in the complaint, but as they pointed out in the briefing, it was not addressed in district court. The city's out. So you've got these officers, and I think it's an interesting point. You have these officers who claim that the practice in the city was to enter the red tag, as long as there was a red tag, because you don't get a red tag unless you followed process and all the rest of it. So as long as there was a red tag, they would go into the building. I guess under the theory that whoever was in there had no authority to be in there, which is not true Monday through Friday, eight to five, because you can go in there to work on the house to cure the red tag issues. Well, okay, but this was different. This was somebody was living there. But so how do you deal with the qualified immunity issue with respect to them? But still a constitutional violation, whether it's city policy or not. If it's a city policy, it's an unconstitutional policy. Right, but you need more. You need to say that any reasonable officer would have understood that they were violating constitutional rights. And that's where I rely on Welch and Payton. Now, the officers ended up there, as I recall, because a neighbor called and said that there was screaming coming from the home and children were being hit, I think something to that effect. That was the basis of the call. Yeah, and the officers, as I recall, say that they were there to perform a child welfare check, essentially, make sure that those children were safe. District Court didn't deal with this issue of exigent circumstances, but given what appear to be assertions of abuse against children going on over the course of the day, one neighbor said, I think, but certainly for at least an hour and a half, why wouldn't the officers have authority to enter that house to make sure that those children are safe? First of all, the neighbor said that she only heard a small portion of it, that an unknown person had said something about the previous hour and a half. So that was the first gap. Officer Wynarski was on the porch and he saw the children briefly. And the officers cannot create probable cause based on what they don't know. So they didn't hear anything or see anything that would support what at that point was an anonymous call. Later, they talked to the neighbor. But at that point, it was an anonymous call from what I can view from the 9-1-1, the catalog. And the sergeant in charge acknowledged that he didn't think the child abuse call itself was enough. So that's what I would rest on. I have one last question, if you don't mind. What about the fact that there was an arrest warrant for a fine out?  No, because there's nothing in their reports or anything to articulate that they associated her, that that being her residential address. And they didn't know, they knew the name from the plate. They didn't know a face. They didn't know that's who were they dealing with. They couldn't infer that she was in the house by virtue of a car with her plate being in the driveway? I think her car was, I don't remember if it was in the driver in the street. Right, but you're saying that's not enough to allow an officer to infer that the person is in the house where the car is parked? No, because if they've gotten that far, then they would have an address associated with that plate. And there was nothing that was produced in any of the documents of their investigation that attached the car or her to that address. Okay, thank you, Mr. Bostic. You'll have your four minutes of rebuttal time. Good afternoon, your honors. May it please the court. My name is Brandon Waddell. On behalf of Defendants Kostenko, Wynarski, Kellum, Ball, Pong, and Larabee, the police officer defendants in this case. Are you splitting your time equally? I will be splitting our time eight minutes for me and seven minutes for co-counsel. A large portion of the plaintiff's argument when it relates to the standards and guidelines for establishing qualified immunity are just inaccurate. As the court knows, the court has said, and the U.S. Supreme Court has said in Pearson v. Callahan that to overcome qualified immunity, defendant must show that a constitutional right was violated and also that that constitutional right was clearly established. But also in Pearson, the court went on to say that a qualified immunity applies when a governmental employee, even if a governmental employee is mistaken about a fact or a law or a mixture of the two. Where the plaintiff's argument fails is in regards to that violation of that clearly established right. In Mitchell v. Forsyth, the Supreme Court also said a right must be sufficiently clear that a reasonable official would understand what he is doing violates the law. Isn't it pretty clear since Payton, you need a warrant to go in the house. That is true, but there was a multitude of reasons why Sergeant Costanco and the other officers believed that they had the ability to go into that house. But why? I mean, they don't have a warrant. They agree there are no edges in circumstances. And as to the warrant, it's not like, knock, knock, let us in, go get a warrant. Well, we have a warrant for this person. They don't even mention that. And these people are saying, just get a warrant. I mean, on what basis would they think that they had a right to enter? Well, as Officer Costanco said in his deposition, it was a totality of the circumstances. It was the fact that it was a child welfare check. They had uncooperative adults in the house that were still yelling at the children. They didn't know what condition the children were in. But I thought they conceded that it wasn't exigent circumstances and that they, in fact, I mean, if you need to go in, you go in. You don't wait, like, all that time, right? I mean, they didn't immediately get there and go, knock, knock, we're checking on these children. I think it was the fact that the house was twice confirmed red-tagged. And then at that point, they don't know why that house is red-tagged. The police don't have access to that. Only access they have is, is it red-tagged, is it not? They don't know why. So it could be loose wiring or raw sewage or a fire hazard. But now they know there's something in that house where people are not supposed to be, and now there's children in the house as well. So what we need to do as police officers is to get in to get those children out to make sure that they are safe. Because the information that the officers have is that the house is not supposed to be inhabited. So with four children in the house, their thinking is, we need to get in there to get the children, for the children's safety. So what's your position on exigent circumstances? Is there a concession that they, these six defendants, did not believe that exigent circumstances existed? Or is that still an issue? I know the district court didn't. Right. Where do we stand with? But where I stand is that the police officers believe that the call itself was not enough for exigent circumstances. But the exigent circumstances existed once they put everything together. And also to just address one other point, it took them so long because they were waiting for attack unit so that they could have a ballistic shield and also a ram for the door because they weren't sure what they were coming against. Sergeant Costango also testified that he could hear that they were covering the doors with something and ended up there was a washing machine, I believe, and a couch on one door, on another door. So they didn't know what they were walking into, so they wanted to make sure they were safe. That's why it took so long. Now, once the plaintiff mentioned Smoke versus Hall, and that plaintiff's brief also improperly discusses qualified immunity by selectively applying certain elements necessary to diminish defendant's qualified immunity while ignoring the elements that would quash the plaintiff's claims. In Perez versus Oakland County, this court in 2006 stated that the plaintiff must show that the right is clearly established in the light of specific context and not just broad general propositions. My position is that the facts of this case by the plaintiff are being ignored. And it's just being, the rule's being looked at just on its face and not applying the facts of what actually happened here to that rule. So how do you, how would you articulate the argument for qualified immunity for the individual officers? That the officers, they were, in order to, I guess, diminish their qualified immunity, it has to be shown that the officers were incompetent in some way or that they knew that what they were doing was a violation of someone's constitutional rights. And I believe, and that's just talking about the federal qualified immunity. So is it that they thought it was okay under the red tag policy? Or they thought it was okay under the exigent, because of exigent circumstances? Or because of the whole totality, they wouldn't have known that they didn't need a warrant or what? Because of the whole totality. The red tag, I think the red tag, just the child welfare call on its own would not have been enough reason for them to enter. But once you add the red tag, you add the existence of the warrant as well. And all that put together gives the officers reason to enter the home. So I want to make sure about this arrest warrant, which I ask about. What's your position on that? Officer Ball, because she was not getting cooperation, checked the cars that were in the driveway. I'm not sure if it was in the driveway or in front of the house on the street. She testified in her deposition that she did not remember if it connected the address or not. But she knew, but her belief was that the owner of that vehicle was in that house. Which it would be speculating, but would lead me to believe that it did connect the addresses. Because she had a belief then that one of those people inside the house was connected with that car and did have a- And what's the timing on that? On the checking of the? She checked the warrant, the license plate, before Sergeant Costanko even arrived. So this was, I believe he arrived 20 to 25 minutes after the initial interaction. When they're repeatedly asking for a warrant, why wouldn't they just say we have a warrant to the arrest of Plano? Again, I believe it was a Lansing City Ordinance Misdemeanor Warrant, which would not have given a reason alone to, and I'm not positive what that warrant was, I can't remember off the top of my head now. Are you saying the warrant alone would not be a reason to go into the house? No, that is what I'm saying. They didn't believe that that warrant alone was enough reason. As a matter of law, is the warrant enough to get in the house? My position would be yes, it would be enough. I believe the officers testified that they didn't believe that warrant alone. Does it matter whether they believed it or not? Are we looking at just subjectively, is the warrant enough? Is that not the question here? They didn't act on the warrant. Excuse me if I'm just not communicating it clearly. They didn't act on the warrant alone because they believed they needed more information, something else in order, if they wanted to get into the house, that the warrant alone was not enough. Okay, but you're saying that they were mistaken in that legal belief that the warrant was not enough. Yes. That in fact the warrant was enough. Correct. So the question is, if legally they had a right to go into the house with a warrant, does it matter that they didn't know that they had that legal right? My position is no, because they are not punished if they are mistaken, if they make a mistake of law or fact. My position is they had the ability to go in that house, not only because of that warrant, but because of all the other circumstances that we've discussed. But I agree with that, that as long as they're authorized, they don't need to know what authorizes them. But if you play that scenario out and you have people that are saying get a warrant, get a warrant, then what would happen is the police would say we have a warrant for the arrest of this person and they would say she will come out. Because that's the authorization to get that person not to go into the house if the person walks out. Again, I'd be speculating to ask you to answer why they didn't have that conversation. I know they did say that they were not getting any cooperation from the adults inside of the house. And then what about Harris? I mean, you don't represent her. No. Okay. Okay. No further questions? Apparently not. Thank you. Thank you, Mr. Waddell. Good afternoon, your honors. If it please the court, Bonnie Tosky, representing and advisor Melissa Harris, plaintiffs assert three claims against defendant Harris. Liability under section 1983 for unlawful search, false arrest, and false arrest as a state cause of action. The touchstone of any Fourth Amendment claim is reasonableness, as the Fourth Amendment prohibits only unreasonable searches and seizures. Reasonable allows, however, for some mistakes on the part of government officials. Remember, intent is the devil here. Reasonableness includes mistakes, human error, garden variety error from day to day. Any mistake made by Harris, if a mistake was made at all, and we don't have a record, we don't know today, nor can we ever know what was on the screen. But you're allowed to have reasonable inferences. I mean, it's a reasonable inference that the screen didn't change in that short time, and that it said what was there. But a reasonable inference as to that fact does not change the result. The result is still negligence, garden variety negligence. Let's go from there. For under Michigan law, the question is gross negligence, right? Yes. It's got to be grossly negligent. So, I mean, if your job is to verify the kinds of information that police in the field need to go forward with either arresting people, breaching the close of the house. I mean, they're calling dispatch to verify their belief that they have authority. So is there really a warrant out for this person? Is this house really condemned? I mean, if it's plainly on the screen and you get it wrong, why isn't that gross negligence, or why can't a jury conclude that it's gross negligence? Human beings, as a simple matter of error, can look at a screen and misread. She could have inputted the incorrect digit on the street address. There could have been very simple variations in data entry or even deciphering the screen. This was not a primary benefit or service provided typically under 911. Remember, Ingham County had just assumed and the local dispatches. It was the city of Lansing that had one, only one of the local dispatches who ran its building department's public service by offering up this service on a website to the public. The city of Lansing, when it had its 911 service, offered this to its officers and other government employees to call in and say, is this a red tag house for whatever reason, whether it was police, law enforcement, building, or other reasons or purposes. Ingham County simply assumed that and trained its supervisors to be able to read that screen on that website in order to maintain that service. It could have been simple human error for her to input. Again, this wasn't the dispatcher who took the calls from the police on the scene. That dispatcher had to relay that request about whether this site, this property, this address was red tagged to her supervisor, who was not an originator of that call. She never spoke with the police. She never spoke with a sergeant on the scene. She had no idea what that original call was about or why someone was calling or who was calling about why or how or is this property red tagged. All Melissa Harris knew was that someone out in the public was calling in asking, is this property? It may have been a real estate speculator. It may have been a builder. It may have been an interested party. The property turned over and over and over. There are many potential reasons why that was true. But here, plaintiff's claims are clearly barred by the doctrine of qualified immunity, which protects all but the plainly incompetent or those who knowingly violate the law. So we've got on one end of the spectrum, plainly incompetent or knowingly, intentionally violate the law. Plaintiffs have the burden, however, here of showing that Harris is not entitled to qualified immunity and they haven't done that. As it pertains to Harris, this case boils down to a straightforward and narrow issue. One, whether Harris knowingly relayed incorrect information about the red tag status of the property. Or two, was Harris so plainly incompetent in doing so? But there is no evidence that Harris knowingly relayed incorrect information about the red tag status of the property to the other. The circumstances permit you to infer that she was plainly incompetent. I would argue that. Knowing the job of a 911 dispatch operator and the pace and the intensity under which they work and the myriad of variations. I thought that she wasn't the dispatch operator. But she's on site supporting and providing backup data and assistance for many other situations that go on at any moment in a dispatch center. She's acting as a supervisor. She's not taking an original call, but she's supporting those who are having difficulty, more complex situations. Again, on this record, which was stipulated, recall the party stipulated to the facts here. There is simply no evidence that Harris knowingly relayed incorrect information about the red tag status. And likewise, no evidence that she even knew the reason prompting the request for that information. Her actions do not evidence the requisite level of incompetence. Here at worst, Harris made a simple garden variety unexplained error which is within the parameters of qualified immunity. Plaintiffs do not comprehend here the term knowingly as used in this context. They equate whether Harris knowingly provided incorrect information with whether incorrect information was actually provided. Harris acknowledged with the benefit of hindsight and discovery that information now known to be incorrect was given and this is reflected in the joint statement of facts. What plaintiffs cannot establish is that Harris knew or had reason to know that the information was correct when she passed it along. Again, merely making a mistake is not enough to establish that Harris either intentionally or knowingly provided that incorrect information. Further, making one mistake does not rise to the level of being plainly incompetent. Remember that, one mistake does not rise to the level of being plainly incompetent. In a creative effort or attempt to establish that this mistake rises to the level of total incompetence, plaintiffs do argue a convoluted failure to train herself theory. But Harris cannot be liable under a failure to adequately train herself theory. First, there is no authority recognizing this theory. And second, failure to train liability cannot be based on a single incident. Recall, instead, it must be supported by a pattern of errors. Plaintiffs, again, have not met their burden to demonstrate that Harris is not entitled to qualified immunity. As the district court found, the record does not establish and there is no way of ascertaining what Harris's computer screen actually showed on that date. I don't know how much more you wish to argue this time, but your time has expired. There may be a few questions for you, though. Thank you. Thank you. Thank you. Judge White, I do want to address one disagreement with a point of law from my colleague. For state governmental immunity, for intentional torts, it is not gross negligence. The key, the first element is in the course of their duties, so we have that. Second element is good faith, and under Michigan's law for a subjective test, which we argue subjective matters are always very inappropriate for summary judgment. The third element is whether it is ministerial or discretionary. So, gross negligence is for negligence in Michigan, not intentional torts. So, the good faith, do you have any evidence from which the jury could infer that it wasn't in good faith? The problem for Ms. Harris is, I will acknowledge that I can make an argument that her failure to properly inform herself on how important that was and being careful about it blends toward good faith. That's not my strongest argument. For her, the denial of qualified immunity comes into fact that this is a ministerial task, not discretionary. Looking it up and reading the screen and relaying what you see is ministerial. Okay. So, in terms of the city defendant- In what- I'm sorry. Let's say you get past that hurdle. What is the substantive cause of action there? It's false arrest for the state? False arrest and malicious prosecution, state law claims. So, how do you connect the misreading to those two torts? The arrest was for occupying a red tag dwelling for Ms. Wright. I think the way I ended up sorting that out in my brief is that the only false arrest claim that can reach back to Ms. Harris is for Plaintiff Wright. Because Plaintiff Finout had the warrant, so it's fine. But Ms. Wright, Tyler was later based upon what they found. So, Ms. Wright was arrested for resisting obstructing, for not obeying their commands, which obviously we say weren't lawful, and occupying a red tag premises. So, her arrest was for the very thing that Ms. Harris reported. But if she's getting arrested anyway for resisting, what do you do about that? Well, their commands for them to come out of the building were not lawful because the building wasn't red tagged. So, the police commands, it's failing to obey a lawful command, that's the gist of the local ordinance. So, there wasn't anything lawful about what they told her to do. She was within her rights to stay within her dwelling and demand a warrant. So, very quickly with my remaining time, did any facts at the scene take that call and elevate it into something that would give them authority to enter in it? And we say no, because Wynarski saw the children, and he's the one that stepped in the window until they yelled at him to get back out. So, he just stepped in, and then they yelled at him to get out. So, he has additional liabilities, I think, because of that. But- But did he testify that he saw the kids and he wasn't concerned for them? Boy, I think he may have had a failure of recollection at his deposition, but I may be mistaken, but I think my client testified that the children were visible to him. Right, but, I mean, we have to look at it from his standpoint. Right, and I would have to go back and detail his, I don't remember if he had a failure of recollection or not, whether he saw the children, but that was our position. My time has expired. Okay, counsel, thank you for your arguments today. We appreciate them. Case will be taken under submission.